MARVIN N. BENN & ASSOCIATES, LTD., Plaintiff-Appellant, *v.* NELSEN
STEEL AND WIRE, INC., *et al.*, Defendants-Appellees.

First District (4th Division)    No. 81-1631

Opinion filed June 24, 1982.

George W. Hamman and Wayne H. Michaels, both of Chicago, for appellant.

Edward S. Silber, John R. F. Baer, and Paul G. Simon, all of Chicago, for appellees.

JUSTICE JIGANTI delivered the opinion of the court:

The plaintiff, Marvin N. Benn & Associates, Ltd. (Benn), is a professional service corporation organized to render legal services pursuant to the Professional Service Corporation Act (PSCA) (Ill. Rev. Stat. 1979, ch. 32, par. 415—1 *et seq.*). Benn entered into a contract with Transplex, Inc., an Illinois corporation. Benn alleged that the defendants, Nelsen Steel & Wire, Inc., and Daniel Nelsen, tortiously interfered with its contract with Transplex. The defendants moved to dismiss the complaint pursuant to sections 45 and 48 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, pars. 45 and 48). The trial court dismissed the complaint on the basis that Benn is a corporation to provide legal services and services ancillary to the legal services. Since Benn's contract with Transplex was primarily a business contract which was not for legal services or services ancillary to any legal services, the trial court concluded that it was against public policy for a court to enforce such a contract. Consequently, it was also against public policy for a court to entertain a cause of action for tortious interference with such a contract.

Benn contends that the contract was for legal services and services ancillary thereto. Furthermore, Benn contends that such a contract, even if beyond the powers of a legal professional service corporation, is not violative of public policy.

The terms of the contract at issue are as follows:

"It is hereby agreed between MARVIN N. BENN & ASSOCIATES, LTD., and Transplex, Inc., * * * that:

Marvin N. Benn & Associates, Ltd., *will search for* and *provide* to the parties named contacts for the *sale of any and all goods,* materials, including other products, and for the *organization of joint ventures* in and to Tiawan [*sic*] and or mainland China.

Should such efforts by Marvin N. Benn & Associates, Ltd., cause

any such products and materials to be traded or ventures to be entered either on Tiawan [*sic*] or in mainland China, each signatory hereto agrees to pay to Marvin N. Benn and Associates 50% of all monies received, less reasonable expenses as a result of said contacts. * * *

This agreement shall be subject to the laws of Illinois and *represents the complete agreement between the parties.* Any changes in this agreement must be reduced to a writing and signed by all the parties." (Emphasis added.)

The contract is typed on stationery entitled "Law Offices, Marvin N. Benn & Associates, Ltd." Marvin N. Benn signed the contract as representative of Marvin N. Benn & Assoc., Ltd.

Approximately eight months after the filing of the original complaint, but before the court had ruled on the motions to dismiss, Benn filed a supplemental memorandum which included an affidavit from Marvin N. Benn. The affidavit stated:

"1. That sometime in November, 1979, Mr. Way-Sun Liao, an individual and the president of Transplex, Inc. and Robert Chang, an individual, came into my office seeking *legal services* to help them complete transactions between China and the United States. They were interested in setting up the proper corporate structures for international transactions with the best tax advantage. They were also interested in obtaining contacts with different suppliers of materials and services to be bartered with the government of China.

2. They informed me that they had no money to pay me and asked me if I perform [*sic*] the services on a contingency basis.

3. A discussion ensued as to what that contingency would be and we agreed that a reasonable fee would be one half of any and all broker's fees received by them resulting from any contacts that I provided.

4. They also sought *legal advice* regarding whether or not certain items could be sold to China, and if so, how. I provided *contacts* and *legal services*, including negotiations of proposed contracts in China while I was in China with them and further negotiations of contracts in their behalf in the United States.

5. The *business contacts that I provided were incidental to the legal services* required to bring this whole venture into being." (Emphasis added.)

When the trial court ruled, it had before it the contract, the affidavit and a copy of the plaintiff's articles of incorporation which state under the heading of "Purposes for which the corporation is organized" that Marvin N. Benn is a:

"Professional Corporation: *to practice the profession of law* and rendering that type of professional services and *services ancillary thereto.*" (Emphasis added.)

The defendants argue on appeal, as they did in the trial court, that Benn cannot support an action for tortious interference with contract based on this agreement because the terms of the contract violate public policy. As support for this argument, the defendant cites section 415—6 of the PSCA, which states:

"A professional corporation may be organized under this Act only for the purpose of rendering *one specific type of professional service* and *services ancillary thereto.*" (Emphasis added.)

The defendant also cites certain Canons of the Illinois Code of Professional Responsibility adopted by the Supreme Court of Illinois and certain Illinois State Bar Association Ethics Opinions. These sources will be discussed later in this opinion.

The first question on appeal is whether this is a contract for legal services and services ancillary thereto. The plaintiff argues that the trial court abused its discretion in concluding that the primary purpose of the agreement was to provide business services to Transplex rather than legal services because the affidavit and the contract were before the court. The affidavit states that "the business contacts that I provided were incidental to the legal services." Benn therefore urges us, as it did the trial court, to consider the primary purpose of the contract in the light of the affidavit.

We believe that it was not error for the trial court to conclude that the primary purpose of this contract was to render business services to Transplex even when construed in the light of the affidavit. The affidavit attempts to show that this agreement grew out of an arrangement between the parties in which legal services were primary and this contract was only ancillary to these legal services. However, under the terms of the contract, Benn agrees to "search for and provide to the parties named contacts for the sale of any and all goods, materials, including other products," and to facilitate "the organization of joint ventures in and to Tiawan [*sic*] and or mainland China." Transplex on its part "agrees to pay to Marvin N. Benn & Associates 50% of all monies received, less reasonable expenses" as a result of said contacts. The agreement is silent on the subject of legal services to be rendered. The words "legal services" or the word "legal," itself, appears nowhere on the face of the document. There is no mention of legal fees, contingent or otherwise, to be paid for such legal services. The contract further states that Benn's remuneration is to be based upon supplying business "contacts" to Transplex rather than upon the performance of legal services. Specifically, Benn will be reimbursed for introducing business people to Transplex and will be paid a percentage of the amount of money generated by these business contacts.

■■ The trial court concluded as a matter of law that this contract was clear according to its terms; that this was a contract to render a business service to Transplex. The business service was to find customers for Transplex. Construction of a contract is a pure question of law and the court must determine this from the document's clear language. (*Kravis v. Smith-Marine, Inc.* (1974), 20 Ill. App. 3d 483, 314 N.E.2d 577.) Therefore, assuming that the facts contained in the affidavit are true as part of a well-pleaded complaint, we still believe that it was reasonable for the trial court to conclude that the primary purpose of this contract was to create a business arrangement, and legal services were only ancillary to this agreement.

Having once decided that the primary purpose of this contract is to render business services and any legal services are to be ancillary thereto, we next reach the question of whether or not it is against public policy for a court to entertain an action based upon tortious interference with such a contract. The plaintiff claims that the trial court erred in holding that it was against public policy to entertain such an action based on this contract because public policy is such an elusive concept.

■■■ We do not believe that public policy in the area of a contract which involves the professional conduct of attorneys is elusive. An agreement is against public policy if it is injurious to the interests of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or is at war with the interests of society or is in conflict with the morals of the time. (See *Ziegler v. Illinois Trust & Savings Bank* (1910), 245 Ill. 180, 91 N.E. 1041.) In the instant cause, we are dealing with a contract signed by Marvin N. Benn, an attorney, as representative of a legal professional corporation organized under the PSCA; written upon the stationery of this legal professional corporation; which has as its primary purpose a business transaction with ancillary legal services. The indicia of public policy regarding lawyers, acting in a dual capacity as lawyers and in some other business or professional capacity, is threefold. The public policy of Illinois on this subject can be found in its statutory law, in the Illinois Code of Professional Responsibility adopted by the Supreme Court of Illinois on July 1, 1980, and in various ethical opinions issued by the Illinois State Bar Association. These are all appropriate sources for defining Illinois public policy. *Illinois State Bar Association v. UMW, District 12* (1966), 35 Ill. 2d 112, 219 N.E.2d 503; *People v. Buster* (1966), 77 Ill. App. 2d 224, 222 N.E.2d 31.

■■ The strongest indicator of public policy is a statute. Where the legislature speaks upon a subject, upon which it has constitutional power to legislate, public policy is what the statute passed by it indicates. (*Henderson v. Foster* (1974), 59 Ill. 2d 343, 347, 319 N.E.2d 789, 792.) Section

415—6 of the PSCA deals specifically with approved functions of lawyers who have incorporated under its aegis. The statute expressly provides that such a corporation may render one specific type of professional service and services ancillary thereto. The specific type of professional service for which Benn & Associates was organized is contained in its articles of incorporation as "the profession of law." Therefore, public policy as embodied in the legislative mandate under section 415—6 of the PSCA can be said to disapprove a contract by a legal professional corporation which renders business brokering services as its primary function and only secondarily legal services.

■■■ Supreme Court Rules have the function of law (*Harris v. Annunzio* (1952), 411 Ill. 124, 103 N.E.2d 477) and thus are another strong indicator of public policy in the area of attorney conduct. The Illinois Code of Professional Responsibility is a Supreme Court Rule. (81 Ill. 2d R. 1—101 *et seq.*) The Illinois Code of Professional Responsibility adopts two disciplinary rules which are relevant to an attorney acting in a dual capacity. Rule 2—102(c) states:

> "A lawyer who is engaged both in the *practice of law* and another profession or *business shall not so indicate on his letterhead*, office sign, or professional card, nor shall he identify himself as a lawyer in any publication in connection with his other profession or business." (Emphasis added.)

Rule 2—103(a) states:

> "A lawyer shall not by private communication * * * directly or through a representative, recommend or solicit employment of himself, his partner or his associate for pecuniary gain or other benefit and *shall not for that purpose initiate contact with a prospective client.*" (Emphasis added.)

The Illinois State Bar Association has interpreted Rule 2—103(a) and Rule 2—102(c) in various "Ethical Opinions." Professional Ethics Opinion No. 677 (69 Ill. B. J. 386 (1981)) specifically deals with the problem of practicing a business out of the same law office. The opinion states that the conduct of another business in the same office from which the attorney conducts his legal practice is a form of solicitation or recommendation. The opinion concludes that it is the intent of the Code as adopted by the Illinois Supreme Court "to keep the practice of law and other profession or business separate." The opinion states that this is true even when the lawyer is performing such dual professional services for the same client. The problem is that such conduct "opens the door to an accusation that the attorney is soliciting business." 69 Ill. B. J. 386 (1981).

The rationale as to why public policy is offended when lawyers engage in in-person solicitation has been stated by the United States Supreme Court. Although the Supreme Court of the United States in

*Bates v. State Bar of Arizona* (1977), 433 U.S. 350, 53 L. Ed. 2d 810, 97 S. Ct. 2691, approved advertising for attorneys, the court was careful to draw a distinction between advertising and in-person solicitation of clients. The court stated that any such in-person solicitation "might well pose dangers of overreaching and misrepresentation not encountered in newspaper announcement advertising." (433 U.S. 350, 366, 53 L. Ed. 2d 810, 825, 97 S. Ct. 2691, 2700.) The Supreme Court again addressed itself to the problem of in-person solicitation by attorneys in *Ohralik v. Ohio State Bar Association* (1978), 436 U.S. 447, 56 L. Ed. 2d 444, 98 S. Ct. 1912. The court stated:

"The substantive evils of solicitation have been stated over the years in sweeping terms: stirring up litigation, assertion of fraudulent claims, debasing the legal profession, and potential harm to the solicited client in the form of overreaching, overcharging, under representation, and misrepresentation. The American Bar Association, as *amicus curiae*, defends the rule against solicitation primarily on three broad grounds: It is said that the prohibitions embodied in DR2—103(A) ˋand 2—104(A) serve to reduce the likelihood of overreaching and the exertion of undue influence on lay persons, to protect the privacy of individuals, and to avoid situations where the lawyer's exercise of judgment on behalf of the client will be clouded by his own pecuniary self-interest." 436 U.S. 447, 461, 56 L. Ed. 2d 444, 457, 98 S. Ct. 1912, 1921.

The Supreme Court of Illinois has cited with approval the rationale against in-person solicitation by lawyers given in *Ohralik*. (See *In re Teichner* (1979), 75 Ill. 2d 88, 387 N.E.2d 265.) The Illinois Supreme Court also dealt directly with a situation in which a "Trade Mark Service" owned by an attorney was found to be a "feeder" for the attorney's law practice and a basis for his in-person solicitation of legal clients. (*In re Miller* (1955), 7 Ill. 2d 443, 131 N.E.2d 91.) In affirming the disbarment of the attorney, the court responded in the following way to the defendant's argument that a lawyer may own and operate a business alongside of his law practice if he does not exploit the business with a motive to convert it into a medium of solicitation. The court stated: "The offense of solicitation of business is not one which imports venality, criminality, fraudulent practices or moral turpitude. [Citation.] Nevertheless its practice is inimical to the good reputation of the bar in general, is strictly prohibited and studiously to be avoided." *In re Miller* (1955), 7 Ill. 2d 443, 454, 131 N.E.2d 91, 97.

■■ When the contract at issue here is scrutinized in the light of a public policy rationale against "feeder" businesses and in-person solicitation by lawyers, we agree with the trial court that it offends public policy. The terms of the contract provide a situation in which a business transaction

may ultimately be used as a "feeder" for legal services or a contractual scheme in which business contacts may be used as a basis for soliciting legal employment. Although we recognize that such a conclusion may only be speculative, anything which might tend to debase the learned professions is at war with the public interest and is therefore contrary to public policy. (*In re Miller* (1955), 7 Ill. 2d 443, 131 N.E.2d 91.) Also any contract which might have the effect of facilitating in-person solicitation by lawyers has a tendency to injure the public and is inconsistent with sound policy and good morals. *Ziegler v. Illinois Trust & Savings Bank* (1910), 245 Ill. 180, 91 N.E. 1041.

A contract which has as its subject something which has a tendency to be injurious to the public or against the public good will not be enforced by an Illinois court. (*People v. Herrin* (1918), 284 Ill. 368, 120 N.E. 274; *In re Estate of Johnson* (1949), 339 Ill. App. 110, 88 N.E.2d 886; *Martin v. City of Greenville* (1977), 54 Ill. App. 3d 42, 369 N.E.2d 543.) In the instant cause, the plaintiff filed a complaint against the defendant for tortious interference with a contract that an Illinois court will not enforce because it is against public policy.

Therefore, we believe that the trial court was correct in dismissing the complaint.

Affirmed.

JOHNSON, P. J., and LINN, J., concur.