(No. 59268.

*In re* MARSHALL I. TEICHNER, Attorney, Respondent.

*Opinion filed September 20, 1984.—Rehearing denied November 30, 1984.*

CLARK, GOLDENHERSH and SIMON, JJ., dissenting.

Jerome Larkin, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Harte, Ltd., of Chicago (William J. Harte, of counsel), for respondent.

JUSTICE UNDERWOOD delivered the opinion of the court:

This is a disciplinary proceeding brought against the respondent attorney, Marshall I. Teichner, who was admitted to practice in 1959. The Administrator of the Attorney Registration and Disciplinary System (87 Ill. 2d Rules 751 through 771) filed a two-count complaint charging the respondent with (1) overreaching, charging an excessive and unconscionable fee, and dishonest and deceitful conduct, and (2) commingling and conversion of client funds. Following three days of testimony, including numerous witnesses presented by each party, the hearing panel determined that the charges in both counts had been proved and recommended that the respondent, whom this court in 1980 had suspended for two years for solicitation (*In re Teichner* (1979), 75 Ill. 2d 88), be disbarred. A unanimous Review Board agreed.

Both of the charges here involved stem from the re-

spondent's representation of Helen Escobedo, the complainant, in matters arising from the death of Juan Escobedo. While Juan Escobedo and Helen Escobedo were never formally married, the record is clear that they had been living together for over 20 years, had two children born of their relationship, and were generally recognized throughout the community as husband and wife. Prior to this relationship, Juan Escobedo had been married to Heriberta Hernandez Escobedo, and although they had been long separated, they apparently were never divorced.

Juan Escobedo was hospitalized as a result of an industrial accident on November 4, 1977, at his place of employment, General American Transportation Company, and died on November 8. On November 15, Helen Escobedo completed the necessary claim form to obtain payment under Juan's employer's group life insurance policy with the Metropolitan Life Insurance Company (Metropolitan). She had been substituted for Heriberta Escobedo as beneficiary under this policy in 1971. On the claim form, Helen Escobedo identified herself as the wife of Juan Escobedo. The employer's representative who assisted her in completing the claim form advised her that the claim would be paid in approximately 30 days.

Following submission of the claim form, also on November 15, complainant consulted the respondent for the first time. The appointment was made for her by her adult son, whose union secretary, from whom the son sought advice, recommended respondent. He and complainant discussed the group life claim and other potential claims relating to a separate accidental death policy, savings and pension plans, a workers' compensation claim and a products liability claim against Hyster Manufacturing Company, the manufacturer of the vehicle involved in the injury to Juan Escobedo. At this first

meeting, complainant advised the respondent that she had already filed a claim under the Metropolitan group life policy, but that she was concerned about her entitlement to the proceeds because she was not legally married. Respondent's testimony, which was not, in this respect, disputed, indicates that she told him "she had heard from the real wife, Heriberta, and that it looked like there was going to be another claim made." Respondent agreed to represent her with reference to the Metropolitan claim, and a contingent-fee agreement was executed providing that respondent was to be paid one-fourth of the amount recovered by settlement or judgment.

On November 21, complainant returned to the respondent's office. During this second visit, she executed contingent-fee agreements agreeing to pay respondent one-third of the amount recovered in exchange for representation on the products liability claim against Hyster Manufacturing Company and one-fifth of the amount recovered against the employer on the workers' compensation claim. None of the agreements included any provision for advancing costs or expenses incurred during the course of the respondent's representation.

Metropolitan issued a check in the amount of $27,598.71 payable to complainant on December 9. Following its receipt complainant met with respondent on three occasions before it was cashed on December 19. During her first visit, respondent advised her that the check appeared to be in order and informed her that he was entitled to one-fourth of the amount of the payment from Metropolitan pursuant to the contingent-fee agreement of November 15. He also requested an additional $7,000 in order to prosecute the products liability claim. Complainant hesitated at paying the additional $7,000, and the end result of this meeting was that the respondent retained the check and advised her to consider his

entitlement to the amount requested.

On her second visit during this period, complainant again discussed with respondent his request for the additional $7,000 and also questioned the amount of work performed by him and the amount of his fee with reference to the Metropolitan claim. Following a heated discussion, respondent offered to return the check and withdraw as her attorney, but she ultimately agreed, at her son's urging, to pay him as requested. Because it was late in the day, the respondent kept the check and complainant agreed to return on a future date to cash it.

On December 19 complainant returned to respondent's office. Respondent accompanied her and two of her children to his bank in order to negotiate the check. Because she was the sole payee, it was necessary for respondent to arrange with bank personnel to cash the check. He contacted the assistant vice-president of the bank, who offered to approve the negotiation of the check if respondent would endorse it. The vice-president's testimony that respondent said "he didn't feel like he wanted to put his signature on the back of the check" is undenied, although respondent now says he refused to endorse the check because he was not the payee. The bank officer then indicated that he would approve the check if respondent would provide a letter guaranteeing the endorsement and payment of the check. This was done.

At respondent's direction, the bank gave Helen Escobedo three cashier's checks, one for $4,500 payable to her and one for $4,750 payable to each of her two children for a total sum of $14,000, and an envelope containing the remaining $13,598.71 in cash. Upon returning to the respondent's office she retained the three checks and gave respondent the envelope with the $13,598.71 in cash. Her testimony that respondent told her that payment of the money to the children was bet-

ter "for purposes of taxes," and that respondent gave her no receipt for the cash is uncontradicted.

In the proceedings before the hearing panel, respondent testified that he was unsure what he had done with that portion of this payment attributable to the products liability claim. He had, however, previously advised the Administrator by letter that the funds had been deposited into his firm's client-fund account. Respondent attempted to explain the inconsistency as carelessness in dictating the letter. The bank records produced by the Administrator clearly established that no deposit of the funds had been made, and respondent ultimately conceded that he might simply have spent the money. Notwithstanding the uncertain disposition of these funds, respondent testified that filing fees and undescribed investigation expenses were attributed to this products liability file and that $1,000 was subsequently disbursed from this amount to Helen Escobedo as a loan. The sum of $5,109 was ultimately returned to her following her filing of the disciplinary complaint.

Complainant subsequently retained counsel to proceed against the respondent with reference to the contingent fee taken by him from the proceeds of the Metropolitan group life insurance policy. In order to settle that claim, respondent paid complainant's new counsel $9,200, constituting the amount claimed plus interest, and also gave her attorney a promissory note for his fee for recovering these funds. As to this count, the hearing panel found the $7,000 fee unconscionable, and that "Respondent engaged in fraudulent and deceptive behavior toward Helen Escobedo to enforce collection of the fee in stating that he performed significant professional services, and that his services were a material factor in effecting the payment by Metropolitan." The panel also referred to complainant's eighth-grade education and lack of business experience, as well as her heart ailment and dia-

betic condition, in criticizing respondent's lack of sensitivity to the inability of a potential client to evaluate the need for legal counsel, which had also been noted in the earlier disciplinary proceeding. *In re Teichner* (1979), 75 Ill. 2d 88, 115-16.

The respondent's major contention before this court is that the Administrator failed to prove by clear and convincing evidence that respondent charged excessive fees and converted and commingled client funds as alleged in the complaint. Initially, we note that since the hearing panel, which hears the testimony and observes the demeanor of the witnesses, is in the best position to weigh conflicting testimony and to make determinations regarding the credibility of witnesses, its factual determinations are to be given substantially the same weight as those of other fact-finding bodies. (See, *e.g., In re Harris* (1982), 93 Ill. 2d 285, 295; *In re Kink* (1982), 92 Ill. 2d 293, 301.) In this case, the extensive "Report and Recommendation" of the hearing panel, which was adopted by the Review Board, carefully details the evidence presented by both parties. While the record does contain a number of conflicts and contradictions in the testimony of witnesses for both the Administrator and the respondent, the hearing panel acknowledged that there were "instances of confusion or mistake in [complainant's] testimony," but stated such instances did not "suggest any intentional dishonesty on her part," and that the panel's factual references were based upon other testimony and exhibits in the record. We believe the findings of the panel are clearly supported by the record.

We believe, however, that the panel was, perhaps, unduly critical of respondent's action in securing a contingent-fee contract on the Metropolitan claim at the November 15 meeting. Initially, the hearing panel determined that this claim was not an adversarial matter

which justified respondent's actions in securing a contingent-fee agreement. As earlier noted, that agreement was executed by complainant ·at respondent's office, where she had gone after completing the claim form with the assistance of personnel from Juan Escobedo's employer. While she was advised by the company personnel that she could expect payment in approximately 30 days, there is no evidence in this record that she related this fact to respondent. Further, notwithstanding this statement, complainant testified that she was concerned with her right to the proceeds of this policy and unsure that she would receive the payment and so advised the respondent. Additionally, respondent's testimony that complainant had told him "she had heard from the real wife, Heriberta, and that it looked like there was going to be another claim made" was undisputed.

The hearing panel found that complainant received payment under this policy in the normal course of business within one month of her claim. That this routine payment would be forthcoming, however, was not known to respondent at the time the contract was executed. Too, the later-discovered fact that, as the designated beneficiary of the policy, Indiana law permitted her recovery, independent of the question of her formal marital status, cannot properly be used to call into question the propriety of the contract at the time of its making. While the insurer may have been aware of the statute so providing, it does not appear to have been known to either respondent or complainant on November 15. In retrospect, of course, respondent's conduct seems virtually indefensible. But judging, as we must, in light of the circumstances as then presented to him, we conclude that respondent's apparent belief that Helen Escobedo's claim might prove questionable was not an unreasonable one. While we agree with the panel that the better course for respondent to follow would have been to advise complainant to await word from

the company before proffering the contingent-fee contract, we do not view his failure to do so as completely unwarranted. That is not to say, however, that we believe the contract entitled respondent to the fee he claimed.

The hearing panel further determined that respondent was not entitled to any fee under the contingent-fee agreement because there was no "suit" or "claim for damages" and that the proceeds did not result from a "settlement or judgment" as required by the contract. That instrument provided:

> _11/15/77_
>
> I hereby retain and employ _MARSHALL I. TEICHNER LTD_ attorney to prosecute and/or settle all suits and claims for damages against _METROPOLITAN Life INSurance Company_ ~~and property damage~~ _Resulting in the death of Juan Escobedo_ on account of personal injuries and property damage arising out of an accident, which occurred at or near _GATX CORP. — RailROAD fee — East Chicago, Indiana._ on the _4th_ day of _November_ A.D. 19_77_
>
> And I agree to pay _him_ as compensation for _His_ services a sum of money equal to _ONE fourth (1/4)_ of any amount realized from said claims either by settlement or judgment.
>
> x _Helen R. Escobedo_
>
> It is further agreed that no settlement will be made without the consent of the injured party.
>
> It is further agreed that there will be no charge for services of any kind unless a recovery is made.
>
> _Marshall J Teichner LTD_
>
> WERNER PRINTING 172 PAMP FORM 60

We agree that Helen Escobedo's insurance claim does not fit neatly into the ordinary meaning of a "suit" or "claim for damages," and the circumstances here demonstrate the hazards of using preprinted forms without adapting the printed portions to the particular needs of the case. We believe, however, that while the contract could certainly have been more precisely drafted, it is inescapable, based upon the testimony of respondent and claimant, that it was the insurance proceeds which were

the subject of the contingent-fee agreement.

There is greater merit, in our opinion, in the hearing panel's position that no fee was due unless recovery occurred pursuant to a "settlement" or "judgment." Obviously there was no judgment, and a settlement normally presupposes a dispute or disagreement. (Black's Law Dictionary 1231 (5th ed. 1979); Webster's Third New International Dictionary 2079 (unabridged) (1979).) Here, the insurer did not question complainant's right to the insurance proceeds. Its payment was routine, and, as the hearing panel found, complainant would have received the same amount at the same time had she never seen respondent. Given the fact that the unquestioned, routine payment here does not come within the normal definitions of a settlement, and did not result from a judgment, and that ambiguities are to be construed against the drafter (*Weiland Tool & Manufacturing Co. v. Whitney* (1969), 44 Ill. 2d 105, 116; *Cedar Park Cemetery Association v. Village of Calumet Park* (1947), 398 Ill. 324, 333; *Bank of North Carolina, N.A. v. Rock Island Bank* (7th Cir. 1978), 570 F.2d 202, 207), we cannot disagree with the panel's finding that the terms of the contract do not entitle respondent to a fee.

Had recovery of the insurance proceeds resulted from payment of a judgment or settlement of a contested claim, we assume the contract would not have been challenged. Because of this, apparently, respondent argues that the existence of a valid contingent-fee contract should terminate this court's inquiry into the excessive-fee charge. We do not agree. The purpose of this court's attorney-disciplinary process is to safeguard the public, maintain the integrity of the legal profession, and protect the administration of justice from reproach. (*In re Schelly* (1983), 94 Ill. 2d 234, 241.) Within this framework, it is not only the prerogative but the duty of this court to guard against the collection of an excessive fee.

In *In re Kutner* (1979), 78 Ill. 2d 157, 164, this court specifically held that, where there is an unconscionable fee fixed in an attorney-client agreement, the matter is subject to action by the Attorney Registration and Disciplinary Commission. Although that case involved a fixed-fee contract, we believe its holding applies with equal force to contingent-fee agreements, with the contingent nature of the contract serving as an additional factor to be considered in determining the reasonableness of the fee charged. " 'A contingent fee contract is always subject to the supervision of the courts as to its reasonableness.' " *Pocius v. Halvorsen* (1963), 30 Ill. 2d 73, 83, quoting *Tonn v. Reuter* (1959), 6 Wis. 2d 498, 95 N.W.2d 261. See also *United States v. Vague* (7th Cir. 1983), 697 F.2d 805, 806.

At the times involved here DR 2—106 of the Illinois Code of Professional Responsibility (Illinois State Bar Association (1970)) provided in pertinent part:

"(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or excessive fee.

(B) A fee is excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional rela-

tionship with the client.

    (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

    (8) Whether the fee is fixed or contingent."

While those rules were not binding upon this court, they constituted " 'a safe guide for professional conduct and an attorney [could] be disciplined for not observing them.' " *In re Kutner* (1979), 78 Ill. 2d 157, 164.

    Respondent contends that his fee was justified based upon the contingent-fee contract and the work he claims was performed. This work, he testified, included research and telephonic negotiations with the employer and Metropolitan. The respondent testified that he directed a lay, clerical employee, Reginald Hill, to undertake research involving common law marriage, insurance law and the law of bigamy in Indiana. Hill also testified to this effect. There were no notes or other records of any such research presented, and the hearing panel was clearly skeptical of this testimony.

    Similarly, the limited contact between the respondent's office and the employer occurred after the check had been issued by Metropolitan to complainant, and there is no corroborative evidence as to the substance of any negotiations. The respondent also testified that he contacted the insurance company by telephone "periodically a number of times" in order to facilitate prompt payment of the group life insurance proceeds. His testimony regarding the content of a call in complainant's presence was disputed by her, and the supervisor of group life and disability claims from the insurance company testified the company's file did not reflect any telephonic contacts. The employee responsible for reviewing this claim and authorizing payment testified there was no dispute concerning this claim and that he had no telephone conversations with any attorney concerning it. Further, the claim was received, processed and approved

by Metropolitan within four days. We conclude that the hearing panel's determination that the respondent's claimed services are "artificial" and "exaggerated" is clearly supported by the evidence.

The respondent's actions also constitute significant evidence that he himself was concerned about the collection of this fee. He concedes that he did not send a notice of lien to Metropolitan or otherwise advise the insurance company in writing of his representation of Helen Escobedo. He did not want his signature on the check, and it was he who directed, "for purposes of taxes," that the funds be disbursed in the form of cashier's checks to complainant and the children while he himself took $13,598.71 in cash for which he tendered no receipt.

Giving due consideration to the factors listed in DR 2—106 and the circumstances here presented, we conclude that a lawyer of ordinary prudence would be left with a definite and firm conviction that a fee of approximately $7,000 in connection with the insurance proceeds in the circumstances of this case was not only in excess of a reasonable fee, but was unconscionable as the hearing panel found. We concur with the determination of the hearing panel and Review Board that the collection of this fee warrants disciplinary action.

Count II of the complaint charges the respondent with commingling and conversion of client funds. He admits that, when the check from Metropolitan was negotiated, he received approximately $7,000 in cash in order to prosecute the products liability claim. He contends that this money was a retainer fee and therefore he was free to utilize it for his own purposes. The Administrator contends that this money was an advance against costs for which the respondent had a duty to account to the client. The hearing panel found that these funds belonged to Helen Escobedo and that the respondent com-

mingled and converted the funds to his own use.

The uncertainty surrounding these funds is to a large degree attributable to the actions of the respondent himself. Incredibly, there was neither a complete nor accurate record with reference to the receipt, character, or disposition of these funds. Before the hearing panel, the respondent testified that these funds were a retainer and thus he was free to utilize them. However, in correspondence to the Attorney Registration and Disciplinary Commission during the investigation of this matter, and in response to questions specifically concerning these funds, the respondent, on three separate occasions, unequivocally stated that these funds were advanced to cover expenses. In one letter, the respondent further stated that the unexpended funds were to be returned to Helen Escobedo, although in his testimony he sought to explain that language as meaning it was to be credited to her account in calculating his fee. Further, at the hearing the respondent was unsure whether he had deposited these funds into any account or whether he spent the cash. However, in the earlier correspondence to the Attorney Registration and Disciplinary Commission, the respondent had stated that the funds had been deposited and remained in his clients' fund account to be used in conjunction with additional expenses. At the hearing, the respondent explained that his prior characterizations of these funds as an advance against costs were attributable merely to an improvident choice of language. The hearing panel found respondent's explanations of these inconsistencies "ambivalent," "not convincing," and "not creditable," and we see no reason to disagree.

But even were we to accept respondent's contention, he would not be exonerated of this charge. He contends that this money was accepted in order to pay costs as they were incurred, with the remainder constituting attorney fees. DR 9—102(A)(2), as in effect at all times rel-

evant herein, provided that all funds belonging in part to a client and in part presently or potentially to the lawyer had to be deposited into a separate account maintained for client funds independent of the lawyer's funds. Further, under DR 9—102(B)(3), as in effect at the time, the respondent was required to maintain complete records of all funds of a client coming into his possession and render appropriate accounts regarding them. No such deposit was made in this case, and, while there exists a listing of some of the costs which respondent attributes to the products liability claim, nowhere is there a complete record of the amount received and the costs incurred. The cited disciplinary rules were intended to prevent the exact problem presented in this case, and are certainly relevant in a determination whether the alleged commingling occurred.

We also deem it significant that the contingent-fee agreement concerning the products liability claim makes no mention of any additional fee or any payment if the claim proved unsuccessful. There was never any written amendment, supplement, or notation reflecting the purported retainer fee, and their absence undermines respondent's contention that he was entitled to these funds as fees based upon a separate understanding with Helen Escobedo.

We believe the evidence as a whole supports the hearing panel's finding, subsequently adopted by the Review Board, that the respondent commingled and converted funds as alleged in count II. There is ample support in the record for the panel's determination that these funds belonged to Helen Escobedo. Respondent simply induced her to provide him with additional funds in order to facilitate prosecution of an additional claim he was already bound to prosecute pursuant to a prior contingent-fee contract. Disciplinary action is clearly warranted against respondent on this charge.

The hearing panel and Review Board have both unanimously recommended that the respondent be disbarred. This court, of course, has the ultimate responsibility for determining and imposing the appropriate sanction, and to this end the recommendations of the hearing panel and Review Board are advisory only. See, e.g., In re Ackermann (1983), 99 Ill. 2d 56, 63; In re Chapman (1983), 95 Ill. 2d 484, 492; In re Zahn (1980), 82 Ill. 2d 489.

As previously indicated, respondent was admitted to the Illinois bar in 1959. In 1980, as a result of a prior disciplinary proceeding, the respondent was suspended from practice for a period of two years based upon a finding of improper solicitation. (In re Teichner (1979), 75 Ill. 2d 88, cert. denied (1979), 444 U.S. 917, 62 L. Ed. 2d 172, 100 S. Ct. 232.) While we normally consider prior discipline as significant in determining an appropriate sanction, we note that the circumstances are somewhat different here, in that the misconduct involved occurred prior to the initiation of the earlier proceedings.

We also note the substantial character evidence presented on behalf of respondent, who called several character witnesses and submitted numerous affidavits attesting to his character and fitness to practice law. While this evidence is significant, the broad conclusions of good character cannot excuse the specific misconduct established in this case. It is also significant that respondent has repaid the monies here involved. We note, however, that this did not occur until after the disciplinary proceedings were filed. In fact the group life insurance policy fee was repaid only after complainant retained another attorney to proceed against respondent.

In determining the appropriate sanction, as well as in evaluating the facts discussed above, we have also considered the previous statements made by Helen Escobedo which are contained in the record. For example,

following the filing of her complaint with the Attorney Registration and Disciplinary Commission, she wrote a letter to the Commission expressing her satisfaction with the respondent's services. While such statements may be helpful, neither the Commission nor this court is bound by them, and we believe the hearing panel quite properly questioned the significance of this letter. Respondent admits that he asked complainant to write it, and she testified that, in fact, the respondent drafted the letter for her, an assertion which he denies. Similarly, the two statements taken from her by respondent, his counsel, and a court reporter during the course of the disciplinary investigation in which she generally expressed satisfaction with the representation by respondent are of questionable value. The first statement resulted from an unannounced visit and was taken when complainant was ill and on her way to the doctor's office. The second statement, which was apparently taken in an effort to confirm the first statement, was taken immediately preceding the repayment to her of the insurance proceeds fee earlier collected by her attorney. Further, the questions asked during both of these statements were, as noted by the hearing panel, conclusional and complex, and the monosyllabic answers somewhat inconclusive.

As we mentioned, this misconduct preceded that for which respondent was earlier suspended. Consequently, respondent is not a recidivist in the ordinary sense. If he were, disbarment would be virtually automatic, given the serious nature of the misconduct in both the earlier case and this. Similarly, we believe disbarment would have resulted had the cases been joined in a single prosecution, for the extensive solicitation present in the earlier case coupled with the unconscionable fee, commingling and conversion shown here would have left us with little choice. (*In re Feldman* (1982), 89 Ill 2d 7, 11; *In re Stillo* (1977), 68 Ill. 2d 49, 54.) Consequently, we do not

consider that the fact that this misconduct which occurred earlier was prosecuted later inhibits us from imposing the discipline we consider appropriate and which would have been imposed had the charges been presented in their normal sequence or simultaneously.

As our opinions emphasize and as we earlier stated, the fundamental purpose of disciplinary proceedings is " 'to maintain the integrity of the legal profession, to protect the administration of justice from reproach, and to safeguard the public.' " (*In re Armentrout* (1983), 99 Ill. 2d 242, 253; see also *In re Zahn* (1980), 82 Ill. 2d 489, 493.) Fulfillment of those objectives requires that one who has manifested the degree of insensitivity to ethical standards demonstrated here and in the case disposed of earlier be disbarred. It is so ordered.

*Respondent disbarred.*

JUSTICE CLARK, dissenting:

I cannot agree with the majority that the respondent's conduct in this case warrants disbarment. While each case of attorney discipline presents a unique factual situation and must be decided on its own merits, a degree of uniformity in the application of sanctions is desirable. (*In re Andros* (1976), 64 Ill. 2d 419.) The facts in this case are similar to those in *In re Crane* (1983), 96 Ill. 2d 40, and in that case we held that the respondent should be suspended from the practice of law for three years.

In *Crane*, the respondent was charged with overreaching, charging excessive fees, and breach of the fiduciary duty he owed to his minor clients. We held that since the complainants were minors, who placed an extraordinary degree of trust and confidence in the respondent, that he was under a special duty not to abuse that relationship and to avoid even the appearance of impropriety. In the instant case, Helen Escobedo is an

adult with an eighth-grade education, poor physical health, and a lack of business experience. In both *Crane* and the instant case, the respondents received large sums of cash without issuing bills or giving receipts. The respondent in *Crane* was also alleged to have advised his clients to make statements he knew to be false to the court, an additional charge which is not present in the instant case.

I believe that, since the facts in these two cases are so similar, the sanctions imposed should also be similar. I agree with the majority that respondent's prior discipline should not be considered in determining the appropriate sanction, and therefore believe that disbarment in this case is too harsh and that the respondent should have been suspended from the practice of law for three years.

GOLDENHERSH and SIMON, JJ., join in this dissent.