Jack S. **KAPLAN**, Plaintiff–Appellant,

v.

**PAVALON & GIFFORD,**
Defendant–Appellee.

No. 92–3770.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1993.

Decided Dec. 13, 1993.

Jack S. Kaplan, pro se.

Allan N. Karlin (argued), Allan N. Karlin & Associates, Morgantown, WV, for plaintiff-appellant.

Mitchell S. Goldgehn (argued), Nathan H. Lichtenstein, Lisa J. Brodsky, Aronberg, Goldgehn, Davis & Garmisa, Chicago, IL, for defendant-appellee.

Before BAUER, KANNE, Circuit Judges and WOOD Jr., Senior Circuit Judge.

KANNE, Circuit Judge.

In 1986, Jack S. Kaplan, an attorney then practicing law in Illinois, was retained by James Cohn and Lisa Bahn Cohn to represent their minor child in connection with a lawsuit alleging injuries sustained during the child's birth. Kaplan agreed to represent the Cohns, but informed them that he lacked experience in medical malpractice cases. He advised the Cohns to retain additional counsel whose area of expertise was in medical malpractice.

Kaplan subsequently referred the case to Geoffrey Gifford, a medical malpractice attorney associated with the law firm of Asher, Pavalon, Gittler & Greenfield, Ltd., an Illinois partnership.[1] Kaplan had previously referred several cases to Gifford in exchange for a percentage of the attorney's fees paid to Gifford's law firm in connection with the referred cases.

In October 1986, the Cohns, Kaplan, and Gifford met in Gifford's office in Chicago. At that meeting, the Cohns, pursuant to Kaplan's recommendation, agreed to retain Gifford as additional counsel. Kaplan contends that all parties understood that Kaplan would continue to serve as counsel of record and would be materially involved in the litigation, even though Gifford would have primary responsibility for the Cohns' case. Kaplan also claims that Gifford expressly informed the Cohns that Kaplan would receive ⅓ of the attorney's fees paid to Pavalon & Gifford. The Cohns purportedly understood and consented to the fee-sharing agreement between Kaplan and Pavalon & Gifford. Pavalon & Gifford denies the existence of the fee-sharing agreement and hence, denies that the Cohns were informed of, or consented to any such agreement.

In early 1987, Gifford entered into a written contingency fee agreement with the Cohns whereby they agreed that Pavalon & Gifford would receive a percentage of the amount recovered from their suit as payment for legal services. All parties agree that there was no reference in the written contingency fee agreement to any separate fee-sharing agreement between Kaplan and Pavalon & Gifford. The Cohns signed the con-

---

1. Gifford and several other partners and associates subsequently left the law firm of Asher, Pavalon, Gittler & Greenfield, Ltd., and formed their own firm, Pavalon & Gifford. In connection with this split, Gifford took the Cohn case with him to Pavalon & Gifford. Pavalon & Gifford thereby became the successor in interest to the rights and duties of Asher, Pavalon, Gittler & Greenfield as to the Cohns.

tingency fee agreement on February 13, 1987.

In August 1991, the Cohns settled their case for $1.5 million. Pursuant to the 1987 written contingency fee agreement, attorney's fees of $362,500 were paid to Pavalon & Gifford. On September 6, 1991, Eugene Pavalon, a partner with Pavalon & Gifford, sent Kaplan a check for $32,500. The letter accompanying the check stated:

> Enclosed you will find our check in the amount of $32,500.00 representing an amount which is the remainder of what our actual fee was less an amount equivalent to ⅔ of the amount of the fee if calculated on a ⅓ fee basis. In other words we retained the amount which would have been ⅔ of a ⅓ fee.

Kaplan demanded that Pavalon & Gifford pay him the additional fee that he believed he was owed under their oral fee-sharing agreement. Pavalon & Gifford refused.

In 1992, Kaplan, now a resident of West Virginia, filed a complaint in the district court in Chicago for breach of contract against both Gifford and the law firm of Pavalon & Gifford. Pavalon & Gifford thereafter filed a motion for summary judgment, arguing that because the fee-sharing agreement was not in writing and was never signed by the Cohns, as required by Rule 2–107 of the Illinois Code of Professional Responsibility, the agreement was unenforceable as a matter of public policy. The district court agreed, granting summary judgment in favor of Pavalon & Gifford, 806 F.Supp. 192.

### Discussion

■ The only issue presented for our review is whether, under Illinois law, a fee-sharing agreement between attorneys that is not in writing and not signed by the client is unenforceable as a matter of public policy. Our review is *de novo*. *Lolling v. Patterson*, 966 F.2d 230, 234 (7th Cir.1992). Rule 2–107 of the Illinois Code of Professional Responsibility [2] provides in pertinent part:

> (A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner or associate of his law firm, unless (1) the client consents in a writing signed by him to employment of the other lawyer, which writing shall fully disclose (a) that a division of fees will be made, (b) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division, and (c) the responsibility to be assumed by the other lawyer for performance of the legal services in question; . . . .

Initially, it is important to note our duty in diversity cases: "we must apply the state law that would be applied in this context by the Illinois Supreme Court." *Green v. J.C. Penney Auto Ins. Co.*, 806 F.2d 759, 761 (7th Cir.1986) (citing *Hill v. International Harvester Co.*, 798 F.2d 256, 261 n. 12 (7th Cir. 1986)). Obviously, cases decided by the Illinois Supreme Court are the most persuasive evidence of how that court would resolve the legal issues presented here. "Intermediate appellate court cases are useful but not binding evidence of what the Illinois Supreme Court would do in a similar case." *Id.* (citations omitted).

Illinois courts will not enforce an agreement between private parties that violates public policy. *O'Hara v. Ahlgren, Blumenfeld and Kempster*, 127 Ill.2d 333, 130 Ill. Dec. 401, 405, 537 N.E.2d 730, 734 (1989). "Whether or not a contract is contrary to public policy depends on the peculiar facts and circumstances of each case." *Id.* (citing *Board of Trustees v. Cook County College Teachers Union*, 74 Ill.2d 412, 24 Ill.Dec. 843, 386 N.E.2d 47 (1979)). "An agreement is against public policy if it is injurious to the interests of the public, contravenes some established interest of society, violates some public statute, is against good morals, tends to interfere with the public welfare or safety, or is at war with the interests of society or is in conflict with the morals at the time." *Marvin N. Benn & Assocs. v. Nelsen Steel & Wire Inc.*, 107 Ill.App.3d 442, 63 Ill.Dec. 251, 254, 437 N.E.2d 900, 903 (1982) (citing *Zeig-*

---

**2.** The Illinois Supreme Court repealed the Illinois Code of Professional Responsibility effective August 1, 1990 and replaced it with the Illinois Rules of Professional Conduct. Rule 1.5(f) of the Rules of Professional Conduct contains the same substantive requirements as Rule 2–107.

*ler v. Illinois Trust and Sav. Bank*, 245 Ill. 180, 91 N.E. 1041 (1910)).

"The indicia of public policy regarding lawyers, acting in a dual capacity as lawyers and in some other business or professional capacity, is three-fold. The public policy of Illinois on this subject can be found in its statutory law, in the Illinois Code of Professional Responsibility adopted by the Supreme Court of Illinois on July 1, 1980, and in various Ethical Opinions issued by the Illinois State Bar Association. These are all appropriate sources for defining Illinois public policy." *Id.* (citations omitted).

Kaplan argues that "in the context of a contract action, the failure of the parties to fully comply with Rule 2–107 is a failure of form, not of substance." Therefore, Kaplan contends, violation of Rule 2–107 does not automatically render a contract unenforceable as a matter of public policy. Kaplan's position finds support in our decision in *Cross v. American Country Ins. Co.*, 875 F.2d 625 (7th Cir.1989).

In that case, Cross, an attorney, entered into a contingency fee agreement with his client, Patterson, whereby Cross was to receive ⅓ of any amount recovered from Patterson's personal injury suit against a taxicab company. *Id.* at 626. The agreement did not state when expenses would be deducted and was not signed by Cross. *Id.* Subsequently, American Country Insurance Company, the cab company's insurer, settled the suit directly with Patterson without consulting Cross. *Id.* at 627. Cross did not receive payment from either the insurance company or from Patterson. *Id.* Cross then brought suit claiming that American Country had engaged in tortious interference with his contingency fee agreement with Patterson. *Id.* American Country defended by claiming that the underlying contingency fee agreement was unenforceable as a matter of public policy as expressed by Rule 2–106 of the Illinois Code of Professional Responsibility. *Id.* at 627–628. Thus, American Country argued, Cross had failed to meet his burden of proving one of the elements of tortious interference with a contract. *Id.* Rule 2–106(c)(2) provided in pertinent part:

Any contingent-fee agreement shall be in writing. The original and each copy shall be signed by the lawyer and by each client.... Any contingent-fee agreement shall set forth ... whether expenses are to be deducted before or after the contingent fee is calculated....

We found that the contingency fee agreement was enforceable, even though it was not signed by Cross and did not indicate when expenses would be deducted, thereby failing to meet the requirements of Rule 2–106(c)(2). A necessary predicate of our decision was a finding that, under Illinois law, the Code of Professional Responsibility is not binding on the courts. *Id.* at 628. In making that finding, we noted that one intermediate Illinois appellate court had previously held that the Code of Professional Responsibility has the function of law. *See Marvin N. Benn & Assocs. Ltd.*, 63 Ill.Dec. at 255, 437 N.E.2d at 904. However, we stated that subsequent Illinois Supreme Court cases had indicated that the Code is not binding on the courts. *See In re Yamaguchi*, 118 Ill.2d 417, 113 Ill.Dec. 928, 932, 515 N.E.2d 1235, 1239 (1987); *In re Teichner*, 104 Ill.2d 150, 83 Ill.Dec. 552, 558, 470 N.E.2d 972, 978 (1984), *cert. denied sub nom.*, *Teichner v. Administrator of Illinois Attorney Registration & Disciplinary Sys.*, 470 U.S. 1053, 105 S.Ct. 1757, 84 L.Ed.2d 820 (1985); *Corti v. Fleisher*, 93 Ill.App.3d 517, 49 Ill.Dec. 74, 86, 417 N.E.2d 764, 776 (1981).

We then applied a "substantial compliance" test, finding that the parties' failure to specify when expenses would be deducted and Cross's failure to sign the agreement, as required by Rule 2–106(c)(2), represented only "minor technical deficiencies." *Cross*, 875 F.2d at 628. Therefore, the contingency fee agreement was not unenforceable as a matter of public policy.

In 1990, following our decision in *Cross*, the Illinois Supreme Court changed or clarified its position regarding the binding effect of the Code of Professional Responsibility. In *In re Vrdolyak*, the court made it clear that the Code is now binding on the courts as a matter of law. 137 Ill.2d 407, 148 Ill.Dec. 243, 560 N.E.2d 840 (1990). ("As an exercise of this court's inherent power over the bar

and as rules of court, the Code operates with the force of law."). *Id.* 148 Ill.Dec. at 248, 560 N.E.2d at 845.

Recognizing that this change in Illinois law undermined the premise on which *Cross* was decided, the district court in this case held that Rule 2–107 is binding on the courts and thus "dictates the conditions under which fee-sharing agreements will be tolerated under law." The district court found that the oral fee-sharing agreement violated Illinois public policy, as expressed by Rule 2–107. We agree with the district court that *Cross* can no longer be considered a valid reflection of Illinois law.

Additionally, a decision of an Illinois appellate court, rendered after the district court reached its decision in this case, specifically requires fee-sharing agreements between attorneys to be in writing and signed by the client to be enforceable. *Holstein v. Grossman*, 246 Ill.App.3d 719, 186 Ill.Dec. 592, 616 N.E.2d 1224 (1993). The *Holstein* court held that "an intra-attorney fee-sharing agreement which is primarily based on a client referral is unenforceable as a matter of public policy where the undisputed facts show that the referred client never consented in writing to the attorneys' arrangement." *Id.* 186 Ill.Dec. at 597, 616 N.E.2d at 1229. The court noted that under previous Illinois law fee-sharing agreements between lawyers for mere referrals were prohibited. *Id.* at 598– 599, 616 N.E.2d at 1230–1231. However, that changed in 1980, when the Illinois Supreme Court specifically approved fee-sharing agreements for referrals by adopting Rule 2–107. *Id.* 186 Ill.Dec. at 601, 616 N.E.2d at 1233. According to the court, the requirements set forth in that rule now represent the public policy of Illinois and require fee-sharing agreements between attorneys for referrals to be in writing, signed by the client to be enforceable:

> While Rule 2–107 of the Illinois Code removed the outright prohibition against fee sharing based solely on a client referral, the supreme court's sanctioning of such conduct was not without significant safe-

guards designed to protect the client.... [W]e believe that the enhanced consent provision and signed writing requirement represent an integral part of the Illinois Supreme Court's public policy trade off which the court struck in giving its official sanction to intra-attorney fee-sharing agreements where the primary service performed by the referring attorney is the referral of a client. Before the rule, the actual effect of fee-sharing agreements on the clients themselves was our paramount concern. This concern, firmly rooted in public policy, required intra-attorney fee-sharing agreements based upon a mere client referral to be held violative of public policy. After the rule, public policy still requires that all such agreements be evaluated with this same concern in mind.... We believe that the signed writing requirement's significant public policy roots require a holding in this case that plaintiff is entitled to no referral fee. The client's right to counsel of his choosing must be preserved, and the signed writing requirement guarantees this result.

*Id.* at 602, 616 N.E.2d at 1234.

Kaplan concedes that the "broad language of *Holstein v. Grossman* supports Pavalon & Gifford."[3] However, Kaplan contends that "the decision is poorly reasoned and fails to fully address critical authorities." Specifically, Kaplan argues that the *Holstein* court failed to consider commentary to the American Bar Association Model Rules of Professional Conduct. The Illinois Code was based on the ABA Model Code of Professional Responsibility, *In re Himmel*, 125 Ill.2d 531, 127 Ill.Dec. 708, 711, 533 N.E.2d 790, 793 (1988), which is the predecessor of the ABA Model Rules. The commentary at issue provides:

> Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not de-

---

**3.** In his Reply Brief, Kaplan urges us to certify the issue presented in this case to the Illinois Supreme Court because "there is now a conflict between this Court and at least one Illinois Court of Appeals...." This we decline to do.

signed to be a basis for civil liability. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duties of lawyers or the extra-disciplinary consequences of violating such a duty.

*American Bar Association Rules of Professional Conduct,* (1983).

This commentary, however, does not appear in the official committee commentary to the Illinois Code of Professional Responsibility, *See generally, Illinois Code of Professional Responsibility and Committee Commentary,* 39 Ill.Dec. XXV–LXV, nor does it appear in the preamble to the current Illinois Rules of Professional Conduct. 139 Ill.Dec. XLIII–XLV (1990). Moreover, even the official Illinois commentary to Code is "advisory only." 39 Ill.Dec. at XXVI. Accordingly, little or no weight should be accorded the ABA commentary in this area. The Illinois courts apparently have not considered it authoritative.

Kaplan does correctly point out that the same appellate court that decided *Holstein* previously expressed concern over the use of the disciplinary rules by attorneys to escape contractual obligations. *Phillips v. Joyce,* 169 Ill.App.3d 520, 120 Ill.Dec. 22, 523 N.E.2d 933 (1988). However, the *Phillips* court explicitly refused to decide whether an attorney can avoid his contractual obligations because of another attorney's violation of the disciplinary rules. Subsequently, the *Holstein* court rejected an argument based on *Phillips* that an attorney should not be permitted to use the disciplinary rules to escape contractual liability. The *Holstein* court stated:

> Plaintiff asserts that "disciplinary rule 2–107 should not be too readily construed as a license for attorneys to break a promise, go back on their word, or decline to fulfill an obligation in the name of legal ethics." … We reject plaintiff's argument….

Our paramount concern must be the effect these fee-sharing agreements have on the clients, not the attorneys involved. "It does not matter whose ox is gored." We will not enforce a fee-sharing agreement which violates public policy.

186 Ill.Dec. at 604, 616 N.E.2d at 1236 (citations omitted).

Kaplan also makes several policy arguments against allowing attorneys to use the ethical rules to escape contractual obligations. However, Illinois has already made a policy choice favoring precise compliance with Rule 2–107 over the adverse effects associated with attorneys using the rule as a means to avoid their agreements with one another. While our opinion in *Cross* may be the preferable approach, as we see it; in a diversity case we are obligated to apply the law as it has been (or would likely be) enunciated by the Illinois Supreme Court.

### Conclusion

In Illinois, a fee-sharing agreement between attorneys for referrals, which is neither in writing nor signed by the client, is unenforceable as a matter of public policy. Therefore, the oral fee-sharing agreement between Kaplan and Pavalon & Gifford is unenforceable because, as all parties agree, it was not in writing and not signed by the Cohns. Accordingly, the decision of the district court is AFFIRMED.