CITY NATIONAL BANK OF FLORIDA, a National Banking Association, Plaintiff–Appellant,

v.

CHECKERS, SIMON & ROSNER, an Illinois Partnership, and Alan H. Gussis, Defendants–Appellees.

No. 93–3334.

United States Court of Appeals, Seventh Circuit.

Argued April 6, 1994.

Decided Aug. 9, 1994.

Rehearing Denied Sept. 2, 1994.

---

William R. Quinlan, Michael I. Rothstein (argued), Stephen McKenna, Pope, Cahill & Devine, Chicago, IL, Robert P. Frankel, Lapidus & Frankel, Miami, FL, for City Nat. Bank of Florida.

Paul B. Uhlenhop, Charles J. Risch (argued), Lawrence A. Rosen, Lawrence, Kamin, Saunders & Uhlenhop, Chicago, IL, for Checkers, Simon & Rosner and Alan H. Gussis.

Kimball R. Anderson, Julie A. Bauer, Jennifer J. Demmon, Winston & Strawn, Chicago, IL, for Illinois CPA Soc., amicus curiae.

Before COFFEY, EASTERBROOK and MANION, Circuit Judges.

COFFEY, Circuit Judge.

City National Bank of Florida ("CNB" or "the bank") appeals the dismissal of its complaint for fraud and negligence against Checkers, Simon & Rosner, an Illinois-based accounting firm, and Alan Harvey Gussis individually, one of the firm's partners ("the defendants"). We agree with the district court that CNB's complaint against the defendants is barred by the Illinois statute of limitations, 735 ILCS § 5/13–214.2(a). We affirm.

## FACTS

CNB is a "national banking association" with its principal place of business in Miami, Florida. Checkers, Simon & Rosner is an Illinois partnership engaged primarily in the business of providing public accounting, business and financial advisory services, with its principal place of business in Chicago, Illinois. Alan Gussis is a certified public accountant, a resident of Illinois, and a partner at Checkers, Simon & Rosner.

CNB alleged that "[i]n the early Summer months of 1988" one Robert Sheridan contacted the bank "for the purpose of borrowing money" to finance his real estate ventures. CNB requested that Sheridan provide a "personal financial statement" and Sheridan hired Checkers, Simon & Rosner to prepare a "Statement of [Robert Sheridan's] Financial Condition [as of] June 30, 1987," ("the 1987 statement"). Included within the 1987 statement was an "Accountants' Compilation Report," which is a collection of financial information that is "the representation of management (owners) *without [an] undertaking by the accountant to express any assurance on the statements." American Institute of Certified Public Accountants Standards,* AR § 100.04 (emphasis added). Defendant Alan Gussis was the Checkers, Simon & Rosner partner who oversaw the preparation of the compilation. In the 1987 statement, Checkers, Simon & Rosner reported that *based on Sheridan's representations,* Sheridan had assets totaling $37,603,700 and a net worth of $24,667,300 as of June 30, 1987. In preparing the report *Checkers, Simon & Rosner relied solely on Sheridan's representations concerning his financial position. The accounting firm did not perform an audit of Sheridan.* In an attempt to emphasize that Checkers, Simon & Rosner had not verified the information supplied by Sheridan, the firm included a disclaimer prominently-displayed within the 1987 statement, which stated:

"We have compiled the accompanying statement of financial condition of Robert Sheridan as of June 30, 1987, and the supplementary schedule presented herein, in accordance with standards established

by the American Institute of Certified Public Accountants.

A compilation is limited to presenting in the form of a financial statement information that is the representation of the individual. We have not audited or reviewed the accompanying financial statements and supplementary schedule and, accordingly, do not express an opinion or any other form of assurance on them."

The 1987 statement was delivered to CNB on June 14, 1988.

In "late 1988" Sheridan subsequently submitted an updated personal financial statement to CNB, prepared by Checkers, Simon & Rosner. The 1988 compilation, which appears in the same format as the 1987 statement, reported that as of August 31, 1988, Sheridan had total assets of $41,150,200, a net worth of $29,458,800, and was contingently liable for some $41.3 million. The 1988 statement contained a disclaimer identical to that found in the 1987 statement.

In March of 1989, the bank "agreed to lend Robert Sheridan $500,000 based upon the representation set forth in the financial statements provided." CNB disbursed the first $200,000 of the unsecured loan to Sheridan on August 23, 1989, payable in full on March 10, 1990. Based on the bank's request for up-to-date information, Checkers, Simon & Rosner prepared a third personal financial statement ("the 1989 statement") on Sheridan's behalf in a format identical to the previous two (including disclaimer) and in turn Sheridan submitted it to CNB. The third statement reported that as of August 31, 1989, Sheridan had assets of $51,399,790, a net worth of $31,385,112, and contingent liabilities of some $55.2 million. On March 1, 1990, following the submission of the third statement, CNB disbursed the remaining $300,000 of the $500,000 loan to Sheridan with a due date of May 12, 1990.

"[S]hortly before" March 10, 1990, the day the $200,000 portion of the loan was due, Sheridan requested, and the bank granted, an extension of time for repayment of the loan. According to CNB, as the due date (May 12, 1990) approached for the repayment of the $300,000 portion of the loan, Sheridan, citing a cash-flow problem, again requested

an extension, claiming that he would repay the entire amount on or before June 26, 1990. Between March 10, 1990, and May 12, 1990, CNB requested another updated personal financial statement, which Sheridan provided. This fourth (1990) statement, which Checkers, Simon & Rosner denies having "significant" involvement with, and which did not include a disclaimer, reported that as of March 28, 1990, Sheridan had assets totaling $57,232,883, a net worth of $32,338,719 and contingent liabilities of approximately $41.7 million. Based on Sheridan's request as well as the representations in this latest financial report, the bank extended the loan's due date from May 12, 1990, to June 26, 1990. However, sometime before the June 26, 1990 deadline, Sheridan, still unable to repay the loan, requested and received a third extension from CNB until July 26, 1990.

Sheridan failed to repay the $500,000 loan by July 26, 1990, and CNB declared him to be in default, and according to the bank, it "immediately requested additional financial information from Sheridan." After Sheridan provided the information, CNB through its investigation, "discovered that [Sheridan's] prior representations set forth in the various personal financial statements were false, inaccurate and misleading." On October 2, 1990, CNB filed suit against Sheridan in the Eleventh Judicial Circuit of Dade County, Florida, alleging "fraudulent misrepresentation" and that "the Financial Statements were false in that values assigned to the assets fraudulently exaggerated the value of Robert Sheridan's assets and failed to contain a truthful, accurate picture with respect to the liabilities affecting the assets." Following the filing of CNB's lawsuit against him, in the spring of 1991, Robert Sheridan filed for United States bankruptcy protection in the United States District Court, Northern District of Illinois, Eastern Division. CNB challenged the dischargeability of Sheridan's debt and filed an adversary proceeding in bankruptcy court, alleging that Sheridan had committed fraud. On March 26, 1992, CNB deposed Gussis, the Checkers, Simon and Rosner partner assigned to the Sheridan matter. According to CNB, it learned for the first time at this deposition that Check-

ers, Simon & Rosner had maintained a close business relationship with Sheridan for a number of years including preparation of his tax returns and providing various accounting services. CNB also claims that while deposing Gussis, it learned that the accounting firm knew in advance that Sheridan's financial statements were to be sent to CNB for the purpose of obtaining a loan. Accordingly, CNB alleged that Checkers, Simon & Rosner was at least partly responsible for Sheridan's failure to repay the $500,000 loan because "at all relevant times, Checkers[, Simon & Rosner] knew of the false, misleading and grossly exaggerated nature of the representations contained in the 1987, 1988, 1989 and 1990 statements."

As a result of the Gussis deposition and the information gained therein, on September 29, 1992, the bank filed suit against the accounting firm of Checkers, Simon & Rosner in the Eleventh Judicial Circuit of Dade County, Florida, alleging fraudulent misrepresentation (Count One) and negligence (Count Two). CNB's complaint alleged that "[t]he defendants knew that the values assigned to the assets in the financial statement scheduled as investments in real estate partnerships, accounts receivables, cash and advances to real estate partnerships were false, misleading and grossly exaggerated," and that the firm "prepared the financial statement with the full knowledge and awareness that the financial statement would be circulated to various lenders and prospective lenders, including lenders from whom Sheridan was seeking loans on an unsecured basis." CNB also alleged that it "relied upon the accuracy and representations set forth in the financial statements prepared by the defendant, [Checkers, Simon & Rosner]" and that "[t]he actions of the defendant[ ] were the proximate cause of the loss sustained by the City National Bank of Florida." Finally, the bank claimed that it "sustained damages for a loss of principal, accrued interest and attorneys' fees and costs incurred in connection with various Dade County state court proceedings against Robert Sheridan as well as the overall bankruptcy proceedings including the prosecution of an adversary complaint against Robert Sheridan in the bankruptcy court in Chicago."

On December 7, 1992, Checkers requested removal of CNB's suit to the United States District Court for the Southern District of Florida and the Florida state court transferred the case to federal court. Following the removal, Checkers, Simon & Rosner filed a motion in federal court to dismiss CNB's complaint on the grounds of lack of personal jurisdiction and improper venue. During oral argument on the motion to dismiss CNB's suit, the parties requested that the district court transfer the case to the U.S. District Court for the Northern District of Illinois, and on February 26, 1993, the motion was granted and the case was transferred.

On May 6, 1993, Checkers, Simon & Rosner filed a motion to dismiss CNB's complaint in the Northern District of Illinois based on the two-year Illinois statute of limitations for suits against public accountants. 735 ILCS § 5/13–214.2(a). Relying on *Knox College v. Celotex Corp.*, 88 Ill.2d 407, 58 Ill.Dec. 725, 430 N.E.2d 976 (1981), and *Rozny v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969)), the defendants argued that the limitation period began to run as of the day the plaintiff "knows or reasonably should know of his injury" and "also knows or reasonably should know that [the injury] was wrongfully caused." *Knox College*, 58 Ill.Dec. at 729, 430 N.E.2d at 980. Checkers, Simon & Rosner contended that CNB knew or should have known it had been injured and that the injury may have been wrongfully caused as of July 26, 1990, the day it declared Sheridan in default on the loan. Responding to the defendant's motion to dismiss the complaint, CNB argued that its claim against Checkers, Simon & Rosner was not barred by the two-year statute of limitations because it did not discover that the accounting firm knew that Sheridan's personal financial statements were false and misleading until the time of Gussis's deposition in March of 1992. Thus, CNB argued it had until March of 1994 to commence suit against the defendant, and therefore its suit, filed in September of 1992, was timely.

On August 4, 1993, the District Court for the Northern District of Illinois granted the defendants' motion to dismiss CNB's com-

plaint. The district judge ruled that the bank's complaint was barred by Illinois's two-year statute of limitations because CNB's cause of action against Checkers, Simon & Rosner accrued on July 26, 1990, the day of Sheridan's default, and the bank did not subsequently sue the accounting firm within the two-year statutory limit. The court determined that CNB's cause of action accrued on July 26, 1990, because Illinois law "starts the clock running when a reasonable person has notice of the need to determine whether it has a cause of action. The reasonable person then has two years to do the investigation and decide whom to sue.... This is, after all, a case in which loans went bad, and CNB had in its files the statements prepared by Checkers[, Simon & Rosner]. This case was filed more than two years after the loans defaulted."

The defendants, Checkers, Simon & Rosner, presented several other theories in support of dismissal which the court accepted as alternative grounds for dismissing the case.[1] Because we agree with the district court's dismissal on the statute of limitations issue, we need not address the other claims.

## ISSUE

Whether the district court's dismissal of CNB's suit against Checkers, Simon & Rosner and Alan Gussis on statute of limitations grounds was proper.

## DISCUSSION

### Standard of Review

This court recently stated that:

"We review a grant of a motion to dismiss de novo. Scott v. O'Grady, 975 F.2d 366, 368 (7th Cir.1992). We accept all well-pleaded facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Id.; Prince v. Rescorp Realty, 940 F.2d 1104, 1106 (7th Cir.1991). We are not, however, required 'to ignore any facts set forth in the complaint that undermine the plaintiff's claim

or to assign any weight to unsupported conclusions of law.'" Scott, 975 F.2d at 368 (quoting R.J.R. Servs., Inc. v. Aetna Casualty & Surety Co., 895 F.2d 279, 281 (7th Cir.1989)). Dimmig v. Wahl, 983 F.2d 86, 87 (7th Cir.), cert. denied, —— U.S. ——, 114 S.Ct. 176, 126 L.Ed.2d 135 (1993). In diversity cases, "we must apply the state law that would be applied in this context by the Illinois Supreme Court." Kaplan v. Pavalon & Gifford, 12 F.3d 87, 89 (7th Cir.1993) (citations omitted). "Obviously, cases decided by the Illinois Supreme Court are the most persuasive evidence of how that court would resolve the legal issues presented here." Id.

CNB contends that its September 29, 1992 lawsuit against the accounting firm was timely filed because its cause of action against the firm did not accrue until March of 1992. It cites Gruber v. Price Waterhouse, 697 F.Supp. 859, 865 (E.D.Pa.1988), aff'd, 911 F.2d 960 (3d Cir.1990), for the proposition that Sheridan's "financial problems [did] not necessarily suggest accounting fraud." CNB claims that prior to March 1992, when it took Gussis's deposition and learned of Checkers, Simon, & Rosner's close business relationship with Sheridan, it "had no reason to suspect that [the accounting firm] committed any actionable conduct merely because their client, Sheridan, defaulted on a loan. Instead, it was entirely reasonable for City National to suspect only Sheridan of wrongdoing until, at the earliest, March 1992." In support of its argument that as of July 26, 1990, it had no reason to know of Checkers, Simon & Rosner's wrongdoing, it notes that the district court determined that CNB was not justified in relying on the financial statements prepared by the defendant due to the disclaimer contained therein.

The relevant Illinois statute of limitations reads as follows:

"Actions based upon tort, contract or otherwise against any person, partnership or corporation registered pursuant to the Illinois Public Accounting Act, as amended, or

---

1. The trial court's alternative grounds for dismissal were (1) that CNB's reliance on the financial statement was unreasonable given the clear and unambiguous disclaimers on their face; (2) the defendants did not owe a duty of full disclosure to the bank because there was no privity of contract; and (3) CNB failed to plead fraud with specificity as required in Fed.R.Civ.P. 9(b).

any of its employees, partners, members, officers or shareholders, for an act or omission in the performance of professional services shall be commenced within 2 years from the time the person bringing an action knew or should reasonably have known of such act or omission."

735 ILCS § 5/13–214.2(a). Under Illinois law, the "discovery rule" governs statutes of limitations, such as 735 ILCS § 5/13–214.-2(a), which start to run when the plaintiff "knew or should have known of the existence of the right to sue." *Rozny v. Marnul,* 43 Ill.2d 54, 250 N.E.2d 656, 664 (1969). "The effect of the discovery rule is to postpone the starting of the period of limitations until the injured party knows or should have known of his injury." *Knox College,* 58 Ill.Dec. at 728, 430 N.E.2d at 979.

*Knox College* illustrates the Illinois Supreme Court's application of the discovery rule. Plaintiff Knox College entered into a contract with an architectural firm to design and supervise the construction of a math-science building. The general contractor subcontracted the roofing work to White's Roofing and Insulation, Inc. The architectural firm's original specifications called for a "built-up, bituminous membrane roofing of 4–ply, 20–year bondable organic felt and bitumen system." *Id.,* 58 Ill.Dec. at 727, 430 N.E.2d at 978. The specifications were later changed to 2–ply roofing "with the knowledge of Knox College," [2] based on defendant Celotex's alleged representation that the 2–ply roofing was the "functional equivalent of the 4–ply system." *Id.* The subcontractor, White, installed the 2–ply roofing in September 1970.

The roof began to leak "soon after it was installed[.]" *Id.* White repaired the roof at its own expense from September 1970 until October 1973, at which point the college began to share the expenses of the roof's repair with White, at White's request. The roof "continued to require occasional repair," *id.,* and by May 1976 the college had spent some $13,000 for roofing repairs. In July of 1976, "the college was informed that the entire

roofing membrane and insulation would have to be replaced. However, it was not until November of that year that the college was informed by an independent roofing consultant that the roofing problems might have been caused by deficiencies in the Celotex 2–ply roofing system." *Id.* at 727–728, 430 N.E.2d at 978–979. The entire roof was replaced in the fall of 1977 and the spring of 1978, at a cost of $135,000 to the school. On June 9, 1978, Knox College filed suit against Celotex, among others. With respect to Celotex, Knox College alleged tortious misrepresentation and fraud in the promotion of the 2–ply roofing system rather than the 4–ply system recommended in the architect's roofing specifications. "Specifically, it was alleged that Celotex knew that its product was not suitable for the climate in locales similar to that of Knox College. Despite this knowledge, Celotex did not inform Knox of the situation or withdraw its product from the market." *Id.*

The trial court granted Celotex's motion to dismiss Knox College's second amended complaint, finding that the claims against Celotex were barred by Illinois's five-year statute of limitations. On appeal, the Illinois appellate court reversed, finding that the action, filed on June 9, 1978, was timely because "Knox could not have been expected to know of the right to sue until November of 1976, when an independent expert informed Knox that the failure was or might have been caused by the deficiencies in the 2–ply roofing system." *Id.* Celotex appealed to the Illinois Supreme Court, which stated that:

> [W]e have held that the event which triggers the running of the statutory period is not the first knowledge the injured person has of his injury, and, at the other extreme, we have also held that it is not the acquisition of knowledge that one has a cause of action against another for an injury he has suffered. Rather, we have held in *Witherell v. Weimer,* [85 Ill.2d 146, 52 Ill.Dec. 6, 421 N.E.2d 869 (1981) ] and *Nolan v. Johns–Manville Asbestos,* [85 Ill.2d 161, 52 Ill.Dec. 1, 421 N.E.2d 864 (1981) ]

**2.** Knox College alleged in its complaint that Celotex knew its 2–ply roofing system was not suitable for the climate in locales similar to that of

Knox College but Celotex did not inform Knox College of this problem. 58 Ill.Dec. at 728, 430 N.E.2d at 979.

that the statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused. In those cases it was made clear that the term "wrongfully caused" does not mean that the plaintiff must have knowledge of the defendant's negligent conduct before the statute is triggered.

\* \* \* \* \* \*

Also, it was made clear in those decisions that a plaintiff need not have knowledge that an actionable wrong was committed before the period begins to run. In *Nolan* we stated,

"We hold, therefore, that when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the *party is under an obligation to inquire further to determine whether an actionable wrong was committed.*" (Emphasis added.) *Nolan,* [52 Ill.Dec. 1, 421 N.E.2d 864].

Also, in *Witherell* we stated the rule and obligation of the person to make diligent inquiry in this matter:

"The statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that the injury was wrongfully caused. At that point the *burden is upon the injured person to inquire further as to the existence of a cause of action.*" (Emphasis added.) *Witherell,* [52 Ill.Dec. at 11, 421 N.E.2d at 874].

*Knox College,* 430 N.E.2d at 980.

Applying these principles to the facts before it, the Illinois Supreme Court held that although Knox College knew that the roof leaked almost as soon as it was completed,

[w]e cannot say, as a matter of law, however, that event started the running of the limitation period. Evidence may disclose that built-up roofs of this type often leak following installation due to some minor defects in the application of the material, which are usually easily corrected. It may

be that the nature of the leak and the fact that the subcontractor undertook at once to remedy it were facts which would not cause a reasonable person to investigate further. However, if not the first leak, at some point along the line, Knox had sufficient information to put a reasonable person on inquiry as to whether the nature of the defect in the roof and whether a cause of action existed in favor of Knox. That point must be determined by the trier of fact, and it must determine whether that information was acquired more than 5 years prior to the time that Knox filed suit.

*Id.* at 981. Thus, the court reversed and remanded the case to the trial court "for the factual determination of when the statute of limitations against said defendant began to run[.]" *Id.* at 986–87.

The Illinois Supreme Court has been careful to note that the day on which limitation periods begin to run may be determined as a matter of law by the court. *"Where it is apparent from the undisputed facts, however, that only one conclusion can be drawn, the question becomes one for the court." Witherell,* 52 Ill.Dec. at 11, 421 N.E.2d at 874 (citations omitted) (emphasis added). Although we are not bound by Illinois court's "allocation of issues between judge and jury," *McEwen v. Delta Air Lines, Inc.,* 919 F.2d 58, 60 (7th Cir.1990), as we explain hereafter, we are convinced that in the case at bar, it is apparent from the undisputed facts that as a matter of law, CNB's cause of action against Checkers, Simon & Rosner accrued on July 26, 1990, the day Sheridan defaulted on the loan.[3]

The undisputed facts establish that Sheridan's financial statements, prepared by Checkers, Simon & Rosner, repeatedly set forth that Sheridan had a net worth ranging between $24.6 million (in 1987) and $32.3 million (in 1990). Relying on Sheridan's financial statements, CNB loaned Sheridan $500,000. Yet despite his alleged enormous net worth, Sheridan was unable to repay the loan on the original due date. Sheridan then requested and received three separate exten-

---

**3.** The parties agree that, unlike *Knox College,* the statute of limitations applicable to this case is two years. 735 ILCS § 5/13–214.2(a).

sions of time (some months apart) from CNB in which to make his loan payment, but still Sheridan was unable to pay and was declared in default by CNB. Sheridan's repeated inability to repay the loan should have put CNB on notice of a need to investigate why an individual with such a substantial net worth (as reported by the accounting firm) defaulted and whether, and against whom, the bank may have had causes of action. *See Knox College,* 430 N.E.2d at 980 ("when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed") (quoting *Nolan,* 52 Ill.Dec. at 4, 421 N.E.2d at 868). A thorough investigation mandates that the bank consider the potential liability of all parties involved in CNB's process of making the loan to Sheridan, and obviously the accounting firm which prepared the financial statements upon which CNB relied should have been included in that investigation. Yet CNB did not investigate Checkers, Simon & Rosner's possible liability until March of 1992, and failed to file suit against the firm until September 29, 1992, more than two years after CNB's cause of action against Checkers, Simon & Rosner accrued.

We hold that as of July 26, 1990, CNB was on notice of the need for it to investigate whether it had a cause of action against Checkers, Simon & Rosner for any damages incurred by reason of Sheridan's default. The bank's argument that it had no reason to suspect the accounting firm of wrongdoing until March 1992, when Gussis gave his deposition, is unconvincing for the additional reason that "[i]f a claim accrues even though the victim does not know that he has a legal entitlement to recover, *the fact that the victim does not know who would be the right defendant cannot matter." Central States Pension Fund v. Navco,* 3 F.3d 167, 171 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1062, 127 L.Ed.2d 382 (1994) (emphasis added). As an example, in *Navco* we presented the hypothetical situation in which a shell corporation, C, operated by shareholder, S, without observing the corporate forms, defrauds victim, V. "Correctly believing that C is insolvent, V does not explore the possibility of piercing the corporate veil. Does V's neglect [in failing to investigate S's possible liability] extend the time to make a claim against S? We could not find any case so holding. Plenty of cases reject contentions that particular claims do not accrue until the victim finds out who can be obliged to pay." *Id.* (citations omitted).

Because CNB's cause of action against Checkers, Simon & Rosner accrued on July 26, 1990, its suit against the accounting firm (filed on September 29, 1992) was not asserted within Illinois's two-year statute of limitations under 735 ILCS § 5/13–214.2(a). Accordingly, we conclude that the district court's dismissal of CNB's suit against Checkers and Gussis on the basis of the Illinois statute of limitations was proper. Because our holding makes it unnecessary to consider the merits of the district court's other three grounds for dismissing CNB's complaint, we decline to address the issues that may be associated therewith.

AFFIRMED.