HOUSEHOLD COMMERCIAL FINANCIAL SERVICES, INC., a citizen of the states of Delaware and Illinois, Plaintiff,

v.

Julius TRUMP, a citizen of the state of Florida, Edmond Trump, a citizen of the state of New York, James M. Jacobson, a citizen of the state of New York, and Parker, Chapin, Flattau & Klimpl, a citizen of the states of New York and New Jersey, Defendants.

Nos. 92 C 5010, 92 C 6920.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 9, 1994.

---

Robert J. Kriss, Theodore A. Livingston, Carrie Kiger Huff, Javier H. Rubinstein, Mayer, Brown & Platt, Chicago, for plaintiff.

John G. Jacobs, Robert Plotkin, Jonah Orlofsky, Steven J. Plotkin, Bertrand A. Rice, Joshua Karsh, Plotkin & Jacobs, Ltd., Chicago, for Julius Trump and Edmond Trump.

John G. Jacobs, Robert Plotkin, Jonah Orlofsky, Steven J. Plotkin, Plotkin & Jacobs, Ltd., Jerrold E. Salzman, Phillip Leon Stern, Freeman, Freeman & Salzman, P.C., Bertrand A. Rice, Plotkin & Jacobs, Ltd., Chicago, for James M. Jacobson.

John G. Jacobs, Plotkin & Jacobs, Ltd., Christina M. Tchen, Susan Getzendanner, Kimberley K. Baer, Barry R. Conybeare, Skadden, Arps, Slate, Meagher & Flom, Chicago, Joel M. Wolosky, Alvin Stein, Parker, Chapin, Flattau & Klimpl, New York City, for Parker, Chapin, Flattau & Klimpl.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Defendant Parker, Chapin, Flattau & Klimpl ("Parker") has moved for summary judgment on the complaint of Household Commercial Financial Services, Inc. ("Household") on the grounds it is barred by the statute of limitations. Defendant's motion is denied.

### BACKGROUND

This case is one of many that stem from Wieboldt's bankruptcy. (See this court's opinion of September 29, 1993.) The bankruptcy came on the heels of a leveraged buyout ("LBO") of Wieboldt Stores, Inc. ("Wieboldt's").[1] Household agreed to make a 32.5 million dollar loan to WSI Acquisition Corp. ("WSI") to finance the LBO. On December 20, 1985, Household, WSI and Wieboldt's executed the loan agreement. The loan agreement contained a "no material adverse change warranty" ("warranty"), that indicated that no material adverse change had occurred in Wieboldt's business or condition, except as disclosed in SEC reports, since February 2, 1985. The loan was initially unsecured, but following the completion of the acquisition, was secured by mortgages on Wieboldt's real estate. At the time the LBO was being negotiated and consummated, James M. Jacobson ("Jacobson") was a director of Wieboldt's. Jacobson was concurrently an attorney and partner at Parker. Jacobson also had close ties to Julius and Edmond Trump ("Trumps").

Following the closing of the LBO, Wieboldt's sales dipped and their financial condition worsened. In January 1986, Household received financial reports indicating Wieboldt's had had a "disastrous Christmas season." Household acknowledges that it became apparent shortly after the consummation of the LBO that Wieboldt's financial condition was much worse than had been expected based upon the financial data pro-

vided to Household and the public. Further, on July 31, 1986, Wieboldt's failed to make an interest payment of $275,347.22 to Household. On August 6, 1986, Household sent Wieboldt's a notice of default. Household concedes there was some concern that misrepresentations had been made regarding the LBO prior to September 1986, and had consulted outside experts to review the transaction.

An involuntary petition for bankruptcy was filed against Wieboldt's on September 23, 1986, which was converted to voluntary petition the following day. The debtor-in-possession threatened to bring a fraudulent conveyance claim against Household seeking to invalidate Household's lien on Wieboldt's property. This prompted an investigation by Household of the underlying facts to evaluate the strength of the claim. The rapid deterioration of Wieboldt's apparently prompted some suspicion on the part of Household early in the investigation (early 1987). (Parker's 12(m), ¶ 47; Household's 12(n), ¶ 47.) A settlement agreement was entered into with the bankruptcy trustees on August 12, 1987. The settlement required a payment of $17 million by Household, which was made in October of 1987. Household had decided sometime prior to the settlement that settlement was the most prudent way to mitigate losses on the loan. Household admits it had information that material adverse changes had occurred prior to the LBO sometime in the first half of 1987.

Household has been involved in numerous actions related to the LBO, including several as plaintiff.[2] This case's predecessor was originally filed in December 1990 in the Circuit Court of Cook County and was voluntarily dismissed on October 13, 1992 ("Illinois action"). Case No. 92 C 6920, which this court deemed a refiling of the Illinois action, was filed on October 15, 1992. Case No. 92 C 5010 was filed in this court (originally before Judge Rovner) on July 29, 1992. The cases were ultimately consolidated. Household did not add Parker as a defendant until

---

1. The undisputed facts are taken from the parties' 12(m) and 12(n) Statements.

2. Household has not been hesitant to sue law firms related to the LBO, notably Isham, Lincoln & Beale.

it filed its amended complaint on July 31, 1992. Household seeks to hold Parker liable for the allegedly fraudulent acts of Jacobson.

Parker has moved for summary judgment on the grounds Household's claim was brought after the expiration of Illinois five-year statute of limitations for fraud; Household's complaint against Parker does not relate back to its complaint in the Illinois action; and Parker did not fraudulently conceal any facts that resulted in delay to Household in identifying Parker as a possible defendant.

## ANALYSIS

■■■ Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment the evidence of the non-movant must be believed, and all justifiable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). This court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.

### A. *Accrual of Action*

Parker maintains that Household's claim accrued no later than early 1987, and probably much earlier. Therefore, the filing on July 31, 1992 was after the five year limitations period and barred.[3] Parker emphasizes the disastrous performance of Wieboldt's immediately after the LBO and Household's 1986 suspicions regarding the LBO. Household maintains that no action had accrued until October 1987, at the earliest, when Household paid $17 million in settlement with the bankruptcy trustees. Household maintains it had no action prior to that time, as no damages were incurred until

the payment, as Household had previously believed it would be fully protected by its collateral.

This case is remarkably similar to a recent Seventh Circuit case, *City National Bank of Florida v. Checkers, Simon & Rosner*, 32 F.3d 277 (7th Cir.1994). In *Checkers*, plaintiff Bank had agreed to loan $500,000 to borrower Sheridan in March 1989, at least in part based upon financial statements compiled by defendant accountants which indicated borrower had a net worth of between $24.6 million (1987) and $32.3 million (1990). Borrower requested and received three short extensions on repaying the note (from March 10, 1990 to July 26, 1990). The borrower never paid. On July 26, 1990, the bank declared the borrower in default and subsequently filed a fraud action against borrower in October 1990. Borrower sought refuge in bankruptcy in 1991. During a March 1992 deposition, the bank learned that the accountants had a long relationship with borrower, and, therefore, likely knew the financial statements were false. The bank filed suit against the accountants on September 29, 1992.

The Seventh Circuit concluded that the bank's action accrued as of the default on July 26, 1990, and the action against the accountants was barred by Illinois' two-year statute of limitations for actions against accountants. *Checkers*, 32 F.3d at 284. The court stated that, under Illinois law, the statute of limitations begins to run when a party knows or reasonably should know that an injury occurred and that it was wrongfully caused. *Id.* at 283–84. At that time, the party is under an obligation to inquire further to determine whether an actionable wrong was committed. *Id.*[4]

The *Checkers* court held that the borrower's repeated failure to repay the loan and

---

**3.** The parties do not dispute that the Illinois five-year statute of limitations for fraud applies. *See generally Singletary v. Continental Illinois National Bank*, 9 F.3d 1236, 1240 (7th Cir.1993).

**4.** The court stated that Illinois generally deems determining the time of accrual of action a ques-

ultimate default, when juxtaposed with borrower's apparently substantial net worth, should have placed the bank on notice as to potential wrongdoing. *Id.* at 283–84. The bank, on default, had notice as to the need to investigate why the seemingly unlikely default occurred "and whether, and against whom, the bank may have had causes of action." *Id.* The investigation would require the bank to consider the potential liability of all parties involved in the making of the loan. *Id.* at 283–84. Further, the court rejected the bank's argument that it had no reason to suspect the accountants prior to the deposition by holding "[i]f a claim accrues even though the victim does not know that he has a legal entitlement to recover, *the fact that the victim does not know who would be the right defendant cannot matter.*" *Id.* at 284 (quoting *Central States Pension Fund v. Navco,* 3 F.3d 167, 171 (7th Cir.1993), *cert. den.* —— U.S. ——, 114 S.Ct. 1062, 127 L.Ed.2d 382 (1994)) (emphasis in original).

■ Like the bank in *Checkers,* Household witnessed a borrower default on its obligations bare months after the making of the loan. Wieboldt's defaulted on its interest payment seven months after the closing of the LBO and was in bankruptcy two months after that. The bank in *Checkers* believed it was making a loan well within the means of a very wealthy borrower. Household, presumably, believed it was making a loan to an entity with the capacity to repay. The matter, however, is not as cut and dry as the default in *Checkers.* Wieboldt's was a retailer, a competitive business, and had suffered a "disastrous" holiday sales period. Therefore, there were potential explanations, other than fraud, for the decline and ultimate bankruptcy of the company.

The decline of the company and the filing of bankruptcy are not the only facts involved, however. Prior to the filing of the bankruptcy, Household had been concerned that misrepresentations had been made in connection with the LBO and consulted outside experts to review the transaction. (Parker's 12(m), ¶¶ 40, 41; Household's 12(n), ¶¶ 40, 41.) Further, Household concedes that it knew a material adverse change had occurred in Wieboldt's business, a violation of the warranty, in the first half of 1987. (Parker's 12(m), ¶ 43; Household's 12(n), ¶ 43.)

This court must conclude that Household's action accrued on the filing of Wieboldt's bankruptcy. The default on the loan and the filing of bankruptcy, coupled with Household's discovery of misrepresentations and the unexplained decline in Wieboldt's business, put Household on notice of potential wrongdoing. At that time, Household had a duty to investigate potential claims against involved entities.

Household argues that knowledge of potential misrepresentations is not tantamount to knowing they were fraudulent and that no damage had occurred prior to the settlement. While it is true that knowing a misrepresentation was made and knowing it was fraudulent are two different things, the result does not change. The bank in *Checkers* pointed out the borrower's financial difficulty might have had a nonfraud explanation, yet the Seventh Circuit concluded the duty to investigate potential claims began with the default. Household had loaned over $30 million to an entity that almost immediately began to collapse. Upon learning the representations made to persuade Household to make the suddenly improvident loan *were false,* Household was clearly on notice that an investigation as to whether the misrepresentations were mere mistakes or fraud was clearly warranted.

■ Household's argument regarding ascertainable damages also fails. An entity that enters into a loan agreement that is procured by fraud, which is forced to seek compensation in litigation and pursuing

tion of fact for the jury. *Id.* at 283–84. However, the court, while noting federal courts are not bound by state allocations of issues between judge and jury, indicated that Illinois permits the court to decide the matter as a question of law when only one conclusion can be drawn from the undisputed facts. *Id.* at 283–84.

claims in bankruptcy, with attendant investigations and legal fees, has been injured, even if the amount of damages is not ascertained to a certainty until the dust settles at the conclusion of the legal proceedings. *See generally Singletary v. Continental Illinois National Bank*, 9 F.3d 1236, 1240 (7th Cir.1993) (statute of limitations began to run when phony loan was booked against plaintiff, even though it was unlikely the bank would try to collect.)

As the action accrued more than five years before the filing of the amended complaint on July 31, 1992, the only way Household can maintain its action against Parker is if its complaint relates back to the filing of the Illinois action (December 1990) or the doctrines of equitable estoppel or equitable tolling apply.

## B. *Relation Back*

■ The Federal Rules of Civil Procedure, in particular Rule 15(c), govern whether the amendment of a complaint relates back to the original complaint, even if jurisdiction is based on diversity of citizenship. *Rae v. Klusak*, 810 F.Supp. 983, 984 (N.D.Ill.1993) (J. Shadur).

■ Rule 15(c) provides that an amendment of a pleading relates back to the date of the original pleading when

(1) relation back is permitted by the law that provides the statute of limitations applicable to the action; or

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading; or

(3) the amendment changes the party or the name of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits; and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Federal Rule of Civil Procedure 15(c). The parties agree that the claim will relate back if it meets the "federal" requirements of 15(c)(3) or the Illinois state requirements pursuant to 15(c)(1). Parker claims neither standard is met.

Relation back under Rule 15(c)(3) will be addressed first. Amendments are freely granted under Rule 15(c). *Woods v. Indiana University–Purdue University*, 996 F.2d 880, 883 (7th Cir.1993). Further "mistake" can mean a mistake of fact or law. *Id.* at 887.

■ The issue here begins and ends with defendant Jacobson. At the time of the LBO, Jacobson allegedly wore many hats, including director of Wieboldt's, agent to the Trumps, and partner at Parker. (See Opinion of September 29, 1993.) Household originally sued Jacobson as "director." Household claims it only later learned of Jacobson's involvement in the LBO as partner in Parker, thus warranting adding Parker as a defendant. There is no doubt Parker was aware of the litigation, as Parker acted as defense counsel for Jacobson in the Illinois action. (Household's 12(n), ¶¶ 97–103; Parker's Response to Household's 12(n), ¶¶ 97–103.) Household maintains that the failure to realize Jacobson was acting as an attorney as well as a director was a "mistake."

■ It does not appear that Rule 15 is designed to deal with this type of "mistake." The Seventh Circuit has held that normally a *new* defendant cannot be added or substituted by amendment after the statute of limitations has run. *Worthington v. Wilson*, 8 F.3d 1253, 1256 (7th Cir.1993). There is no relation where there is a lack of knowledge of a proper party, as opposed to mere mistake as to a given party's name. *Id.* at 1256–57. *See also Rylewicz v. Beaton Services, Ltd.*, 888 F.2d 1175, 1181 (7th Cir.1989). In *Worthington*, the original complaint was filed against unknown police officers. The amend-

ed complaint, which provided the identities did not relate back to the original complaint. *Id.* at 1256.

Household is not seeking to identify an existing defendant with a corrected name. Household is seeking to add an additional defendant it was unaware it had a cause of action against at the time of the original filing. This court must conclude such an amendment would not relate back under Rule 15(c)(3).

Household has argued that amended complaints relate back when they involve merely suing a defendant in a different capacity, citing *Hill v. Shelander*, 924 F.2d 1370 (7th Cir.1991). Household maintains it is merely changing Jacobson's capacity from director to attorney. In *Hill*, the Seventh Circuit held that an amended complaint changing the capacity a guard was sued under from his official capacity to his individual capacity related back to the original complaint. *Id.* at 1376. *Hill* supports the fact the complaint could be amended to sue Jacobson in the additional capacity of attorney, but not to add a *new* defendant based on this change in capacity.

■■■ The second way the complaint could relate back, pursuant to Rule 15(c)(1), is under Illinois relation back provision, 2–616(d). Section 2–616(d) applies when the wrong person is named and served, as opposed to the "misnomer" situation where the correct person is served but called by the wrong name. *Borg v. Chicago Zoological Society*, 256 Ill. App.3d 931, 628 N.E.2d 306, 308, 194 Ill.Dec. 809, 811 (1st Dist.1993). In Illinois, claims against newly added defendants in an amended complaint relate back if: (1) the original action is timely; (2) the failure to join the person as a defendant was inadvertent; (3) service of summons was in fact had upon the person, his or her agent or partner; (4) the defendant originally was aware the action was pending; and (5) the new claim grows out of the same transaction or occurrence as the original claim. Illinois Code of Civil Procedure, 735 ILCS 5/2–616(d). The par-

ties dispute two issues on this matter: (1) whether Jacobson was an agent of Parker when served with the complaint in February 1991; and (2) whether the failure to name Parker in the original complaint was "inadvertent."

As to the first issue, Parker emphasizes, and Household concedes, Jacobson was no longer a partner at Parker when he was served with the complaint. Parker further cites a variety of cases where an agency relationship was found not to exist, for purposes of 2–616(d), in a variety of business relationships. However, neither side has cited any Illinois cases dealing with the rather unique relationship between Parker and Jacobson. Jacobson was a former partner of Parker, and the lawsuit relates to matters he worked on while a partner at Parker. Further, he was also a current *client* of Parker, who represented him in connection with these matters.

■■■ Illinois has permitted service on an agent to be found in unusual circumstances. *See Slezak v. Lisle Center, Inc.*, 253 Ill.App.3d 876, 625 N.E.2d 911, 912, 192 Ill. Dec. 756, 757 (2nd Dist.1993) (service found on defendant's agent, even though defendant's agent was served as the agent of another). In addition, § 2–616(d) is to be liberally construed, so as to decide cases on the merits rather than procedural technicalities. *Campbell v. Feuquay*, 140 Ill.App.3d 584, 488 N.E.2d 1111, 1115, 94 Ill.Dec. 864, 868 (5th Dist.1986). Given the novel and continuing relationship of Jacobson and Parker, this court cannot conclude, on the present record, that an agency for purposes of 2–616(d) did not exist.

■■■ "Inadvertence," for purposes of § 2–616(d), means excusable ignorance. *Zincoris v. Hobart Bros. Co.*, 243 Ill.App.3d 609, 611 N.E.2d 1327, 1331, 183 Ill.Dec. 679, 683 (1st Dist.1993); *Newey v. Newey*, 215 Ill.App.3d 993, 576 N.E.2d 137, 140, 159 Ill. Dec. 468, 471 (1st Dist.1991). "Ignorance" is generally defined under Illinois law as a lack of knowledge of the identity or existence of a defendant. *Id; Newey*, 576 N.E.2d at 140, 159 Ill.Dec. at 471. "Inadvertence" generally covers errors that are the result of heedlessness or inattention resulting from concentration on other matters, even if the conduct

includes a degree of negligence. *Evans v. Graber, Inc.,* 115 Ill.App.3d 532, 450 N.E.2d 482, 485–86, 71 Ill.Dec. 47, 50–51 (4th Dist. 1983). A complex organization structure, if it causes confusion in ascertaining the correct defendant, can be a basis for a finding of "inadvertence." *Newey,* 576 N.E.2d at 140, 159 Ill.Dec. at 472; *Evans,* 450 N.E.2d at 485, 71 Ill.Dec. at 50 (failure to join a corporation was inadvertent, as plaintiff did not learn during the course of discovery the corporation was a separate entity until after the statute of limitations had run). "Inadvertence" can also be found where the delay in ascertaining an appropriate defendant is due to ambiguous responses received in discovery. *Campbell v. Feuquay,* 140 Ill.App.3d 584, 488 N.E.2d 1111, 1114, 94 Ill.Dec. 864, 867 (5th Dist.1986). *See also Newey,* 576 N.E.2d at 145, 159 Ill.Dec. at 476 (a court can consider actions by defense attorneys that delay identification of a proper defendant as a factor in evaluating appropriateness of relation back). "Inadvertence" does not excuse the failure to act appropriately and promptly when the true facts are discovered. *Zincoris,* 611 N.E.2d at 1331, 183 Ill.Dec. at 683.

This court must conclude that Household's failure to join Parker was inadvertent. As noted before, Jacobson allegedly participated in the underlying transaction wearing many hats. Household maintains it did not learn Jacobson was acting as a Parker partner during the relevant transactions until well into discovery. The relationships and activities of the parties are obviously not lacking in complexity. Household also maintains that certain discovery responses, which Household maintains were deliberately deceitful, delayed Household's discovery of the true facts. Given that this court must grant Household the benefit of all reasonable inferences[5] at this stage of the proceedings, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), Parker is not entitled to summary judgment on the relation back issue.

### C. *Equitable Estoppel/Equitable Tolling*

Given the court's conclusion regarding relation back, these issues will be addressed only briefly. Equitable estoppel suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent plaintiff from suing, such as concealing evidence of defendant's involvement. *Singletary v. Continental Illinois National Bank,* 9 F.3d 1236, 1241 (7th Cir.1993). Mere denials of liability or refusing to cooperate in the making of the plaintiff's case is not enough to trigger equitable estoppel. *Id.*

Equitable tolling permits the plaintiff to sue after the expiration of the statute of limitations if, through no fault or lack of diligence, plaintiff was unable to sue before the expiration of the limitations period, even though no defendant took active steps to prevent plaintiff from suing. *Singletary,* 9 F.3d at 1241. It is unclear whether his doctrine is recognized in Illinois. *Id.* at 1242. This court, however, for purposes of this motion, will presume Illinois recognizes the doctrine.

This court must conclude from the voluminous and conflicting materials submitted by the parties that issues of fact preclude summary judgment, including such matters as whether Parker delayed Household's discovery of Parker as a possible defendant and Household's diligence in investigating all potential claims. This court notes that the Illinois Supreme Court has expressed a strong preference that such matters be resolved by a trier of fact. *See Jackson Jordan, Inc. v. Leydig, Voit & Mayer,* 158 Ill.2d 240, 633 N.E.2d 627, 198 Ill.Dec. 786 (1994). While this court is not bound by the state court's preference on such matters, this court is bound by the Seventh Circuit's opinion that summary judgment is inappropriate for

---

**5.** An example of the competing inferences that can be drawn from the same evidence involves the fact Household sued other law firms. Parker maintains that this clearly indicates Household knew causes of action were potentially available against the involved law firms but elected not to pursue one against Parker. Household maintains the fact Household aggressively pursued claims against other law firms proves that it would have filed suit against Parker if not misled as to Jacobson's "status."

744

settling issues of notice or intent, where the summary judgment standard is applied with added vigor, or making credibility assessments and selecting between competing inferences. *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1041–1042 (7th Cir.1993). As conflicting inferences can be drawn from the evidence presented, summary judgment is not appropriate.

### *CONCLUSION*

For the reasons given above, defendant Parker, Chapin, Flattau & Klimpl's motion for summary judgment is DENIED. The parties are strongly urged to discuss settlement. The case is set for further status on October 6, 1994 at 10:00 a.m.